FAIRWAY MANOR, INC. *v.* CITY OF AKRON, APPELLEE; SUMMIT COUNTY, APPELLANT.

(No. 11169—Decided December 28, 1983.)

*Mr. Mark I. Wachter,* for plaintiff Fairway Manor, Inc.

*Mr. Steven D. Bell,* assistant law director, for appellee city of Akron.

*Mr. Kerry Bruce* and *Ms. Jane E. Bond,* for appellant Summit County.

MAHONEY, J. Summit County appeals a trial court order upholding a water service contract entered into in 1979 between Summit County, appellant, and the city of Akron, appellee, and finding the contract rates to be reasonable and not unjustly discriminatory. We reverse and remand.

In 1972, the city of Akron ("Akron")

and Summit County ("County") entered into a contract whereby the County agreed to purchase water from Akron on a wholesale bulk basis for resale to customers in Northampton, Bath, Hudson and Boston Townships and the cities of Fairlawn and Stow. The rate schedule contained in the 1972 contract was based on a "used and useful" formula. In 1977, pursuant to the terms of the 1972 contract, Akron notified the County that it would exercise its right of termination in 1979. Officials for both parties negotiated the terms of a new water sale contract for two years.

In May 1979, the parties signed a second contract. The rate schedule was based on the "Akron rate" plus a surcharge percentage. The "Akron rate" is the rate paid by the same class of users within the city limits. The surcharge varies according to the amount of water used by the County. At one point, the County paid rates as high as the Akron rate plus one hundred-five percent.

In late 1980, the County became dissatisfied with the rates being charged by Akron. In January 1981, the County withheld a quarterly water payment, depositing said payment in an escrow account. All subsequent payments were made to the city of Akron. Akron was also dissatisfied with the contractual rate schedule and desired to unilaterally set rates by ordinance. As a result of this dispute, the city of Akron refused to supply water to Fairway Manor, Inc., a condominium developer. Thus, Fairway Manor, Inc. filed a complaint naming the city of Akron and Summit County as defendants and requesting the trial court to order Akron to supply water to its condominium project.

The County answered and cross-claimed. Akron filed a third-party complaint against the County alleging breach of the 1979 contract due to nonpayment and seeking rescission and damages. The County answered, claiming that the contract was entered into under duress and that the contract was unconscionable because the rates are unreasonably high and unjustly discriminatory between users in the same class. The allegations of unreasonableness and unjust discrimination were based on the fact that the city of Tallmadge ("Tallmadge"), also a wholesale bulk consumer, pays the Akron rate plus ten percent while the County has paid as much as Akron plus one hundred-five percent. The County requested damages for alleged overcharges and rescission conditioned on reestablishing the 1972 contract rates.

Fairway Manor, Inc. received its water connection by court order filed April 14, 1983. The matter proceeded to trial between the city of Akron and the County on Akron's third-party complaint. The trial court found that the 1979 contract rates are both reasonable and not unjustly discriminatory and that the contract had not been breached. It refused both to rescind the contract and to award damages to either party.

The County appeals, contending:

## Assignment of Error 2

"A municipal utility rate is unreasonable as a matter of law when it bears no relationship to the cost of providing service and the trial court erred in finding the county rate reasonable when the rate is unsupported by any evidence establishing [that] it was based on the cost of providing water service to the county as a wholesale user."

The rates charged by a public utility, whether privately or municipally owned, must bear some relationship to the present or future cost of providing service. *State, ex rel. Waterbury Development Co., v. Witten* (1977), 58 Ohio App. 2d 17 [12 O.O.3d 29], affirmed (1978), 54 Ohio St. 2d 412 [8 O.O.3d 410]. However, rate making is an inexact science. *Orr Felt Co. v. Piqua* (1983), 2 Ohio St. 3d 166. Several considerations beyond the actual dollar cost of providing service are permitted.

In the instant case, the parties

negotiated the 1979 contract on two levels. Water service technicians employed by both parties proposed rate schedules based on various formulas for computing actual service costs plus reasonable profit. While the technicians appear to have agreed in principle to the formulas, they disagreed as to which elements and costs should be included in the formulas. The rate schedule embodied in the 1979 contract was the result of final negotiations between administrative officials of both governmental entities on a policy level.

Given the inexact nature of rate setting, the mere fact that the agreed upon rate was arrived at via negotiation does not indicate that the contract rates are arbitrary. Facts such as "going concern value," use of Akron's bonding capacity, return on prior investment, value of the contractual commitment and amount of reasonable profit are flexible and, thus, are amenable to negotiation. Appellant has not demonstrated that the 1979 contract rates are unrelated to the cost of providing service.

### Assignment of Error 3

"The trial court erred in refusing to rescind the 1979 water contract between Akron and the County when such relief was requested by both parties in their pleadings."

Contracts may be terminated by mutual consent of the parties at any time and without a court order. *Taylor* v. *Brown* (1915), 92 Ohio St. 287; and *Mahoning County Commissioners* v. *Youngstown* (1946), 39 Ohio Law Abs. 186. However, nothing in the record of the instant case demonstrates a mutual rescission.

The city of Akron apparently desires to rescind in order to unilaterally impose rates by ordinance. Summit County prays for rescission only if the parties are ordered to continue under the 1972 rate schedule until a new agreement can be negotiated. Akron has not agreed to con-

tinue service under the 1972 contract rates. The County has not indicated a desire to pay rates unilaterally set by ordinance. Neither party apparently desires to completely terminate service and to abandon the contract. Thus, we hold the parties have not mutually agreed to terminate the 1979 contract.

### Assignment of Error 4

"The trial court's findings of fact on the issue of the reasonableness of Akron's water rate are insufficient to support the judgment."

In *Freeman* v. *Westland Builders, Inc.* (1981), 2 Ohio App. 3d 212, at 214, the court stated:

"The trial court has the duty of issuing findings regarding all of the ultimate facts which are determinative of the case. *Feller-Olmsted Co.* v. *J. Ritchie & Sons, Inc.* (1963), 119 Ohio App. 148, 150 [26 O.O.2d 339]. A mere recital of the evidence presented is not a finding of fact. *Albright* v. *Hawk* (1895), 52 Ohio St. 362; *Manchester* v. *Cleveland Trust Co.* (1953), 95 Ohio App. 201 [53 O.O. 152]; *McShane* v. *Keiser* (1958), 108 Ohio App. 514 [9 O.O. 2d 495]."

In the instant case, the reasonableness of the 1979 contract rate is the ultimate factual issue. The trial court found that said rate was reasonable. The court was not required either to recite the evidence underlying its factual determination or to explain the reasoning process utilized to reach its conclusion. *Stiver* v. *Stiver* (Sept. 28, 1983), Summit App. No. 11152, unreported. Thus, the trial court's findings comport with Civ. R. 52.

### Assignment of Error 1

"The trial court erred in upholding Akron's rate discrimination between Tallmadge and the County since it is not based on the cost of service nor does it further a legitimate legislative purpose."

In *Orr Felt Co.* v. *Piqua, supra,* at 170-171, the Supreme Court stated:

"When a municipal corporation

chooses to operate a public utility pursuant to a constitutional grant of authority, it functions in a proprietary capacity and is entitled to a 'reasonable profit.' *Niles* v. *Union Ice Corp.* (1938), 133 Ohio St. 169, 181 [10 O.O. 239]. The only restraint imposed by law upon a municipality's proprietary undertaking of providing electrical energy is 'that the rates charged be reasonable and that there be no unjust discrimination among the customers served, taking into account their situation and classification.' *State, ex rel. Mt. Sinai Hospital,* v. *Hickey* (1940), 137 Ohio St. 474, 477 [19 O.O. 159]."

Admittedly, *Orr Felt Co.* involved the unilateral setting of rates by the municipality. However, the requirement that there be no unjust discrimination applies equally to rates set by contracts. See *Western Reserve Steel Co.* v. *Cuyahoga Heights* (1928), 118 Ohio St. 544.

Akron sells water to the city of Tallmadge and to Summit County, both of which are wholesale bulk users. Tallmadge pays the rate of Akron plus ten percent while the County has paid as much as Akron's rate plus one hundred-five percent. We emphasize the fact that rate setting is an inexact science. The record reveals that many municipalities fix rates charged to non-resident users at a resident rate plus a percentage surcharge.

The mere fact that Tallmadge pays a much lower rate does not *per se* indicate that the County's rate is unjustly discriminatory. Tallmadge does not have a long-term contract with Akron. Thus, Akron is not bound to provide water to Tallmadge at a fixed rate over a long period of time. Under the 1979 contract, the County could conceivably enjoy the stability of the contract rates until 1999. Conversely, Tallmadge's rates may be unilaterally set at any time by Akron ordinance, provided, of course, that said rates are reasonable and not unjustly discriminatory. Additionally, Akron has no duty to supply a minimum daily gallonage to Tallmadge or to extend its service to new Tallmadge customers. See *State, ex rel. Indian Hill Acres, Inc.,* v. *Kellogg* (1948), 149 Ohio St. 461 [37 O.O. 137]. However, any difference in rate must be based upon reasonable and fair conditions which equitably and logically justify a different rate. See 12 McQuillin, Municipal Corporations (1970) 231, Section 34.101. See, also, *Boynton* v. *Lakeport Mun. Sewer Dist. No. 1* (1972), 28 Cal. App. 3d 91, 104 Cal. Rptr. 409, quoting the McQuillin text.

The record does not indicate the rationale underlying the Tallmadge rate except to note that Tallmadge has an alternative water supply capable of ready development. Akron clearly has the right to make a reasonable profit on its water sales. Thus, in addition to deducting the value of a contractual commitment, Akron may have decided to forego some of its permissible profit in setting the Tallmadge rates.

However, while the county's rate may be reasonable, it may still be unjustly discriminatory. In considering the issue of unjust discrimination, the trial court stated:

"Unreasonably discriminatory rates as compared to other water customers of the City, particularly Tallmadge, is [*sic*] asserted. The evidence did indeed show a far higher charge to the County than that imposed on Tallmadge. It was apparent from the testimony and admitted by the City that it agreed to a low rate for Tallmadge because Tallmadge had the capability of getting its water elsewhere and the City wanted to keep it as a customer. * * * The County did not have the advantage of bargaining with a fall-back alternative. It had to get its water from Akron at the best price it could negotiate. * * *"

In addition to considering the value of the contractual commitment, the trial court also relied on the fact that the County has no viable alternative water supply. The city of Akron may adjust its profit

factor downward to nonresident users in order to remain competitive. However, Akron may not overcharge any customer based on the value of service to that customer. 12 McQuillin, Municipal Corporations (1970) 232, Franchises, Section 34.101. See *Boynton, supra,* at 98. Thus, the trial court erred in factoring this value of water service to the County into its holding that the discrimination is just.

We hold that the County met its burden of going forward with its evidence to demonstrate the rate differential between Tallmadge and the County is discriminatory on its face. It is now incumbent upon the city to show lawful conditions which justify the rate differential based upon logic and equity.

Whether rates are unjustly discriminatory in any given situation is a question of fact. We reverse the judgment and remand this cause to the trial court to determine whether the difference between the rate paid by the city of Tallmadge and that paid by Summit County is unjustly discriminatory. On remand, the trial court shall not consider the value of service to the County in reaching its decision.

### Summary

We overrule appellant's second, third, and fourth assignments of error. That portion of appellant's first assignment of error contending that the trial court erred by considering the value of service to the County in determining the discrimination in rates was justified is well-taken. The judgment is reversed, and the cause is remanded for further proceedings consistent with this decision.

*Judgment reversed and cause remanded.*

QUILLIN, P.J., concurs separately.

GEORGE, J., dissents.

QUILLIN, P.J., concurring. A municipality is not required to provide water to non-residents. However, once it decides to do so, it assumes the characteristics of a public utility. That means, with limited exceptions, the service may not be unilaterally withdrawn. It means that the rates must be reasonable. And, it means that the rates must not discriminate between similarly situated customers.

Whether rates are reasonable is a different question from whether rates are unjustly discriminatory. A rate may be either reasonable or unreasonable and still be unjustly discriminatory. Some factors may overlap but the issues are separate and distinct.

GEORGE, J., dissenting. The majority remands this cause to the trial court for a determination of whether the rate differential between Tallmadge and the County is unjustly discriminatory. Although both are labeled "bulk users" and the rates appear discriminatory upon their face, there was substantial evidence presented to the trial court demonstrating significant differences between the two users.

The majority seems to reject the relative importance normally accorded to a negotiated agreement such as was entered into between Akron and the County. The County contracted for and received certain benefits which Tallmadge was not afforded. For example: the County had a guaranteed minimum daily supply of five million gallons; the County had a long-term fixed rate; and the County can expand its service to new customers. This last factor has considerable value because the County has a definitive service area which includes large areas yet undeveloped. So that, although the County and Tallmadge were both wholesale bulk users of Akron, there was significant evidence to establish that they were not within the same user class and that the rate differential, though notable, was not discriminatory.

The trial court did not find that Akron considered the County's lack of an alter-

native water supply as a factor used in charging the County a higher rate. Rather, the trial court found that Akron considered Tallmadge's capability of getting its water elsewhere when setting Tallmadge's water rate. In view of this, the record does not support the majority's finding that the trial court wrongfully considered the value of the service to the County in setting the County's rate.

The judgment of the trial court should be affirmed in all respects.